AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

AUG 16 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*      )        Case No.
                                                   )
Ten Target Devices Seized on March 29, 2019        )
by U.S. Border Patrol                              )        **19MJ3468**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324 | Bringing in and Harboring Illegal Aliens |

The application is based on these facts:

SEE AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

US Border Patrol                    *Applicant's signature*

HSI Special Agent Derek D. Nowak
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/15/19

City and state: San Diego, CA

*Judge's signature*

Honorable Allison H. Goddard, U.S. Magistrate Judge
*Printed name and title*

# Attachment A

## *Items to be Searched*

The items to be searched are as follows:

> Black Motorola Cellular Phone
> Model No. XT1650-02
> Type M19AE
> Seizure Number 2019255200009501-004
> Seized from James Madison BOTHERAS II
> ("**Target Device 1**")

> Black and Red Pantech Cellular Phone
> Model No. CDM8992WV
> Serial No. 114000127803
> Seizure Number 2019255200009501-003
> Seized from James Madison BOTHERAS II
> ("**Target Device 2**")

> Blue Cricket Cellular Phone
> Model No. XT1921-2
> Type M377E4
> IMEI No. 352168101447869
> Seizure Number 2019255200009501-005
> Seized from E.J.S.
> ("**Target Device 3**")

> White iPhone 7S Cellular Phone
> Serial No. DNPTN01M6RY2
> IMEI No. 353341073192883
> Seizure Number 2019255200009501-006
> Seized from E.J.S.
> ("**Target Device 4**")

> Apple iPhone 6S Plus Cellular Phone
> Serial No. F2LY37E6HFLX
> IMEI No. 355727070939227
> Seizure No. 2019255200009501-007
> Seized from E.J.S.
> ("**Target Device 5**")

1
2
3
4
5

Blue Motorola Cricket Cellular Phone
Model No. XT1921-2
Type M37E4
IMEI No. 351840099752366
Seizure No. 2019255200009501-008
Seized from E.J.S.
("**Target Device 6**")

6
7
8
9
10

Rose Gold (Bronze) Apple iPad Tablet
Model No. A1954
Serial No. 667WJ3Y4JMXJ
Seizure No. 2019255200009501-012
Seized from E.J.S.
("**Target Device 7**")

11
12
13
14

Black LG Cricket Cellular Phone
Serial No. 711CYFT589259
Seizure No. 2019255200009501-009
Seized from Jose Sotelo-Ayala
("**Target Device 8**")
Grey Samsung Cellular Phone

15
16
17
18

Model No. SMJ327P
HEX No. 35251008864858
Seizure No. 2019255200009501-010
Seized from Mario Suchite-Perez
("**Target Device 9**")

19
20
21
22
23

White Samsung Cellular Phone
Serial No. R28H52PHMST
IMEI No. 358316074957430
Seizure No. 2019255200009501-011
Seized from Juan Lozano-Garcia
("**Target Device 10**")

24      The **Target Devices** are currently in the possession of the Department of Homeland

25  Security and are presently stored at 880 Front Street, San Diego, CA 92154.

26
27
28

2

## Attachment B

### *Items to be Seized*

Authorization to search the cellular/mobile telephones and tablet described in Attachment A (the "**Target Devices**") includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones and tablet for evidence described below.  The seizure and search of the cellular/mobile telephones and tablet shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephones and tablet will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, from January 29, 2019 up to and including March 30, 2019:

     a.  tending to indicate efforts to smuggle illegal aliens into the United States from Mexico, and transport them within the United States;

     b.  tending to identify accounts, facilities, storage devices, and/or  services–such as email addresses, IP addresses, and phone numbers–used to facilitate the aforementioned smuggling efforts;

     c.  tending to identify co-conspirators, criminal associates, or others involved in smuggling aliens from Mexico into the United States and within the United States;

     d.  tending to identify travel to or presence at locations involved in the smuggling of aliens from Mexico into the United States and within the United States;

     e.  tending to identify the movement of proceeds associated with the smuggling of aliens from Mexico into the United States;

     f.  tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

1      g.  tending to place in context, identify the creator or recipient of, or establish the

2           time of creation or receipt of communications, records, or data involved in the

3           activities described above,

4  which are evidence of violations of Title 8, United States Code, Section 1324.

2

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Derek D. Nowak, having been duly sworn, do hereby state that the following is true to my knowledge and belief:

**INTRODUCTION**

1.      I make this affidavit in support of an application for a warrant to search the following electronic devices, as further described in Attachment A (collectively the "**Target Devices**"), and seize evidence of violations of federal law, namely 8 U.S.C. § 1324, as further described in Attachment B:

> Black Motorola Cellular Phone
> Model No. XT1650-02
> Type M19AE
> Seizure Number 2019255200009501-004
> Seized from James Madison Botheras II
> ("**Target Device 1**")

> Black and Red Pantech Cellular Phone
> Model No. CDM8992WV
> Serial No. 114000127803
> Seizure Number 2019255200009501-003
> Seized from James Madison Botheras II
> ("**Target Device 2**")

> Blue Cricket Cellular Phone
> Model No. XT1921-2
> Type M377E4
> IMEI No. 352168101447869
> Seizure Number 2019255200009501-005
> Seized from E.J.S.
> ("**Target Device 3**")

> White iPhone Cellular Phone
> Serial No. DNPTN01M6RY2
> IMEI No. 353341073192883
> Seizure Number 2019255200009501-006
> Seized from E.J.S.
> ("**Target Device 4**")

1
2
3
4

Apple iPhone 6S Plus Cellular Phone
Serial No. F2LY37E6HFLX
IMEI No. 355727070939227
Seizure No. 2019255200009501-007
Seized from E.J.S.
("**Target Device 5**")

5
6
7
8
9
10

Blue Motorola Cricket Cellular Phone
Model No. XT1921-2
Type M37E4
IMEI No. 351840099752366
Seizure No. 2019255200009501-008
Seized from E.J.S.
("**Target Device 6**")

11
12
13
14

Rose Gold (Bronze) Apple iPad Tablet
Model No. A1954
Serial No. 667WJ3Y4JMXJ
Seizure No. 2019255200009501-012
Seized from E.J.S.
("**Target Device 7**")

15
16
17
18

Black LG Cricket Cellular Phone
Serial No. 711CYFT589259
Seizure No. 2019255200009501-009
Seized from Jose Sotelo-Ayala
("**Target Device 8**")

19
20
21
22
23

Grey Samsung Cellular Phone
Model No. SMJ327P
HEX No. 35251008864858
Seizure No. 2019255200009501-010
Seized from Mario Suchite-Perez
("**Target Device 9**")

24
25
26
27
28

White Samsung Cellular Phone
Serial No. R28H52PHMST
IMEI No. 358316074957430
Seizure No. 2019255200009501-011
Seized from Juan Lozano-Garcia
("**Target Device 10**")

2

1   This search supports an investigation and prosecution of James Madison BOTHERAS II,

2   who is presently charged with transportation of illegal aliens, in violation of

3   8 U.S.C. § 1324. A factual explanation supporting probable cause follows.

4        2.     As discussed in more detail below, BOTHERAS was arrested on March 29,

5   2019, when agents with the Department of Homeland Security, United States Border Patrol

6   ("USBP") stopped the black Ford Expedition (the "Expedition") he was driving and

7   discovered four aliens who were illegally present in the United States. The **Target Devices**

8   were seized from BOTHERAS, an individual identified as E.J.S. (who was a passenger in

9   the Expedition but was not charged), three of the smuggled aliens, and the Expedition. The

10   **Target Devices** are currently in the possession of USBP and are presently stored at 880

11   Front Street, San Diego, California 92101.

12        3.     Based on the information below, there is probable cause to believe that

13   searches of the **Target Devices** will produce evidence of the aforementioned crime, as

14   more particularly described in Attachment B.

15        4.     Because this affidavit is being submitted for the limited purpose of

16   establishing probable cause to obtain a search warrant, it does not contain all of the

17   information known to investigators about this investigation. It contains only those facts

18   believed to be necessary to establish probable cause. In addition, information contained in

19   this affidavit is based upon reviews of official reports and records, conversations with other

20   investigators experienced in the area of alien-smuggling investigations, and my personal

21   observations and knowledge. When the contents of documents or statements of others are

22   reported herein, they are reported in substance and in part unless otherwise indicated.

23                   **TRAINING AND EXPERIENCE**

24        5.     I am a Border Patrol Agent with USBP and have been since September 5,

25   2011. To become a Border Patrol Agent (a "BPA"), I completed the United States Border

26   Patrol Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico.

27   As part of this training, I attended criminal investigation training that included course

28

*Affidavit in Support of Search Warrant*

1  studies in, among other things, criminal law, constitutional law, search and seizures, and
2  courtroom procedure.

3      6.    As a U.S. Border Patrol Agent, I am a Federal Law Enforcement Officer
4  within the meaning of Rule 41 of the Federal Rules of Criminal Procedure, that is, a
5  government agent engaged in the enforcement of the criminal laws of the United States,
6  and thereby authorized to request issuance of federal search and seizure warrants.  As a
7  BPA, my responsibilities include the investigation of possible violations of Immigration
8  and Nationality laws (Title 8, United States Code), including alien smuggling in violation
9  of Title 8, United States Code, Section 1324, and related offenses.

10      7.    My work as a BPA includes investigations related to unlawful aliens and alien
11  smuggling.  In the course of my duties, I have worked as the case agent conducting specific
12  alien smuggling and illegal entry investigations.  During my assignments, I have
13  participated in interviews of defendants and witnesses relative to their illegal entry and
14  alien smuggling.  Through my observations and these interviews, I have gained a working
15  knowledge and insight into the operational habits of unlawful aliens and alien smugglers,
16  with particular emphasis on those who attempt to illegally enter, transport, harbor, or
17  smuggle unlawful aliens into the United States from Mexico.

18      8.    Through the course of my training, investigations, work experience, and
19  conversations with other law enforcement personnel, I am aware that it is a common
20  practice for alien smugglers to work in concert with other individuals, and they do so by
21  utilizing cellular telephones, pagers, and portable radios to maintain communications with
22  co-conspirators in order to further their criminal activities.  As an agent with the USBP, I
23  am aware from my participation in alien smuggling cases that telephones are often used by
24  load drivers to communicate with smugglers.  Typically, load drivers transporting aliens
25  within the United States are in telephonic contact with co-conspirators immediately prior
26  to and following the entry of unlawful aliens into a load vehicle, at which time they receive
27  instructions on where and when to pick up the unlawful aliens and where to deliver them.

28

4

*Affidavit in Support of Search Warrant*

9.      Based upon my training and experience as a Border Patrol Agent, and my consultations with law enforcement officers experienced in smuggling investigations, and all the facts and opinions set forth in this affidavit, I further submit the following:

a.      Smugglers use cellular telephones because the devices are mobile and provide instant access to telephone calls, texts, internet, application-based communications platforms, and voice messages;

b.      Smugglers use cellular telephones because they are able to actively monitor the progress of the smuggled aliens while in transit;

c.      Smugglers and their accomplices use cellular telephones because the phones help them arrange for delivery at predetermined locations and monitor / plan for arrival times;

d.      Smugglers use cellular telephones to synchronize drop off and pick up times of aliens;

e.      Smugglers use cellular telephones to notify or warn accomplices about law-enforcement activity, such as the presence and posture of marked and perceived unmarked patrol vehicles, or the operational status of border checkpoints and border crossings; and

f.      The use of cellular telephones by smugglers tends to generate evidence stored on the cellular telephones, including but not limited to emails, text messages, application-based communications, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

10.     Subscriber Identity Module ("SIM") Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages.  Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

11.     Tablets, which are also mobile devices, have many, if not more, of the same

5

features as cellular telephones, and so are attractive to smuggling organizations for the same reasons that cellular telephones are. Tablets too are mobile and provide instant access to texts, internet, application-based communications platforms (*e.g.*, WhatsApp), and, for many models, telephone calls and voice messages.

**FACTS IN SUPPORT OF PROBABLE CAUSE**

12.     According to a report prepared by BPA Jonathan Morales, at about 12:12p.m. on March 29, 2019, BPAs were advised via the service radio to look out for a black Ford Expedition, with California License Plate 6TNS308 (later determined to be the Expedition), traveling east on Interstate 8 from In-Ko-Pah, California. The Expedition was suspected of transporting illegal aliens. I am aware that this general area is close to the international border, and is one where illegal aliens are picked up by people transporting them in cars.

13.     Per his report, at about 12:35 p.m., BPA Morales saw an Expedition, matching the description provided via the service radio, near a rest stop by Drew Road. BPA Morales saw several adult passengers, some sitting on the floor instead of in seats, and with their backs against the doors due to the lack of room. From my training and experience, I know that this is a common indication of illegal aliens getting transported—such aliens often cross the border in groups and need to fit into pick-up cars, even when there is not enough room for each alien to sit comfortably.

14.     Per his report, BPA Morales confirmed that the license plate on the car he was looking at matched the information he had received over the service radio. Having confirmed that he was looking at the Expedition, he turned on his patrol vehicle's lights and siren to pull it over and conduct an immigration inspection. The driver of the expedition—later identified as BOTHERAS—-pulled over on the side of Interstate 8, east of Forrester Road. BPA Morales approached the driver's side door, and identified himself as a Border Patrol Agent. BPA Morales told BOTHERAS to put the Expedition in "Park" and roll down the back windows so that he could conduct an immigration inspection of the adults in the back. In response, BOTHERAS said, "I didn't do anything, man! I just picked

6

1  them up from the side of the road."

2  15.  Per his report, BPA Morales then informed BOTHERAS that he was being
3  placed under arrest for alien smuggling. Around this time, BPA Acevedo also arrived and
4  helped BPA Morales. Per BPA Morales's report, BOTHERAS got out of the Expedition
5  and resisted the BPAs' efforts to arrest him, but ultimately was subdued.[1] After subduing
6  and arresting BOTHERAS, the BPAs were able to conduct an inspection of the other adults
7  in the vehicle. Four adults in the back of the car—Ivan Lozano-Garcia, Sergio Baltazar
8  Sandoval-Arismendi, Mario Agusto Suchite-Perez, and Jose Felipe Antonio Sotelo-
9  Ayala—were citizens of a country other than the United States, and lacked permission to
10  enter the United States. They too were placed under arrest. The woman in the front
11  passenger seat of the car, E.J.S., was arrested initially but not charged.

12  16.  Per the recording of his post-arrest interview, BPA Carlos Reynosa advised
13  BOTHERAS of his *Miranda* rights, witnessed by BPA Wilberto Bueno, which
14  BOTHERAS waived. In summary and as noted in BPA Morales's report, BOTHERAS
15  said that a couple of weeks before this event, he had responded to an advertisement on
16  Craigslist offering transportation work. The first time he did this work, he had picked up
17  and dropped off three people in Commerce, California. He received $500 per person for
18  that job. The night prior to his arrest in this case, BOTHERAS received a call from the
19  same person, offering him another job; he was to pick up four people on private property
20  near Interstate 8 and deliver them to a Denny's parking lot in El Centro, California.
21  BOTHERAS had driven to the pick-up location, picked up the four people found in the
22  Expedition, and began driving towards El Centro before he was stopped.

23  17.  Per the recording of her post-arrest interview, BPA Bueno advised E.J.S. of

24  

25  [1] I am aware from BPA Morales's report and from the depositions of Lozano, Sotelo,
26  Suchite, and E.J.S. that BPA Morales and BPA Acevedo engaged physically with
BOTHERAS, that BOTHERAS's dog jumped out of the Expedition in the midst of the
27  engagement, and that one of the BPAs ended up shooting the dog. I do not believe this
information bears on probable cause, but I note it to inform the Court of the surrounding
28  circumstances.

7

1  her *Miranda* rights, which BPA Reynosa witnessed, and which E.J.S. waived. In summary,
2  and as noted in BPA Morales's report, E.J.S. said that she and BOTHERAS had been in
3  his Expedition, driving from the Viejas Casino, in San Diego, to visit a family member in
4  Indio. E.J.S. fell asleep during the drive and woke up to see four people in the back of the
5  Expedition, and she saw and heard the patrol vehicle's lights and sirens. E.J.S. also
6  appeared to give consent to search the tablet (*i.e.*, **Target Device 7**) and each of her phones
7  except for one, which I believe is **Target Device 4** based on her description of it as a newer
8  iPhone. (In an abundance of caution, and because I cannot say with certainty which **Target**
9  **Devices** E.J.S. gave consent to search.) Per the supplemental report of BPA Jerami
10  Cheatwood, E.J.S. also said, in a call to BPA Cheatwood after her interview, that she had
11  recorded at least part of the encounter with Border Patrol on one of her phones.

12       18.    Ivan Lozano-Garcia was one of the four aliens found in the Expedition. Per
13  BPA Morales's report, Lozano told investigators that he is a Mexican citizen and national,
14  and that he had crossed the border fence with three other people on March 28, 2019 (the
15  day before the arrests in this case). He was to pay $4,000 to be smuggled into the United
16  States. Lozano said another member of the foursome had made a phone call, and that the
17  "smuggler" had instructed the group to get into a dark blue Expedition. The foursome then
18  got into an Expedition and Lozano hid in the back storage area, covering himself with
19  clothes. The Expedition stopped for gas after the foursome got in, and was stopped by the
20  side of the road several minutes later. Lozano also identified BOTHERAS in a "six-pack"
21  photographic lineup as the driver of the Expedition.

22       19.    Subsequently, Lozano gave a material-witness deposition; in summary, he
23  said the following. Lozano said that he traveled to Tijuana on March 24, 2019, and called
24  a contact in the United States who was helping him make arrangements to cross. (In his
25  deposition, Lozano said he was to pay $8,000 to cross.) Lozano's contact put him in touch
26  with "Mario," whom Lozano was apprehended with later (*i.e.*, Suchite). This contact put
27  Lozano and Suchite in touch with a "coyote," a term I know from my training and
28  experience refers to a person who smuggles people over the border. On March 25, the

8

coyote called Lozano and Suchite, and instructed them to travel to Tecate, Mexico. On the bus from Tijuana to Tecate, Lozano and Suchite met Sandoval and Sotelo. Once the four arrived in Tecate, they got into a taxi and were driven to a drop-off location, from where they began walking towards the border. After entering the United States and traveling north, Sandoval made calls with his phone, and then with Lozano's phone, to the "coyote." Lozano later received a call and was told that a truck would soon be arriving. It appears that after this, Lozano's phone began to die, so he put his SIM card into Suchite's phone, and Suchite then received a call explaining that the pickup was going to arrive soon. The group was picked up, and soon after apprehended. Lozano identified a picture of BOTHERAS as the driver of the "truck" that he was in when apprehended.

20.     Mario Agusto Suchite-Perez was one of the four aliens found in the Expedition. Per BPA Morales's report, Suchite told investigators that he is a Guatemalan citizen and national, and that he had crossed the border fence with three other people on March 28, with the help of a foot-guide. He was to pay $8,000 to be smuggled into the United States. Sandoval said that the foursome had been led by a foot-guide; before the foot-guide left the group, he contacted a smuggler, and the smuggler instructed the foursome to get into a black Expedition. The foursome got into the Expedition and Suchite sat in the back seat. The Expedition drove to a gas station for gas, and was pulled over soon after leaving the gas station. Sandoval also identified BOTHERAS in a "six-pack" photographic lineup as the driver of the Expedition.

21.     Subsequently, Suchite gave a material-witness deposition; in summary, he said the following. Suchite said he had traveled from Guatemala to Tijuana, and made arrangements to enter the United States in Tijuana. Suchite received a phone number to call once he arrived in Tijuana, from a friend who was already in the United States, for a person who could help Suchite cross the border. When Suchite spoke to the contact on the phone, the contact told Suchite it would cost $8,000 to cross. After the call, Suchite traveled from Tijuana to Tecate, with the three other people he was apprehended with (*i.e.*, Lozano, Sandoval, and Sotelo). In Tecate, the four met a taxi, with a driver and a guide. The four

9

got into the taxi and were driven to a remote area, where they got out with the guide. The four walked north with the guide, crossing the border and walking north in the United States. After walking north in the United States, they reached the point where they would be picked up. The guide made a phone call at that point, and the four people waited. The next day, the "truck" arrived to pick them up, and they got in. Shortly after, the group was apprehended. Suchite identified a picture of BOTHERAS as the driver of the "truck" that picked them up.

22.     Sergio Baltazar Sandoval-Arismendi was one of the four aliens found in the Expedition. Per BPA Morales's report, Sandoval told investigators that he is a Mexican citizen and national, and that he had crossed the border fence with three other people at about 7:00 p.m. on March 28. His family member was to pay $7,000 for Sandoval to be smuggled into the United States. Sandoval said that the foursome had been led by a foot-guide; before the foot-guide left the group, he contacted a smuggler, and the smuggler instructed the foursome to get into an Expedition. The foursome got into the Expedition and Sandoval sat in the back seat. The Expedition drove to a gas station for gas, and was pulled over ten to fifteen minutes after leaving the gas station. Sandoval also identified BOTHERAS in a "six-pack" photographic lineup as the driver of the Expedition.

23.     Subsequently, Sandoval gave a material-witness deposition; in summary, he said the following. Sandoval said that he made plans to cross the border with his cousin, Sotelo. Sotelo got a phone number for a person in Tijuana who was going to "cross" the two of them. When the two arrived in Tijuana, they spoke with this person on the phone, and understood that they would have to pay $7,000 to be "crossed" over the border. This person, "El Pelon," told the two to travel from Tijuana to Tecate. Sandoval and Sotelo traveled to Tecate; when they arrived, El Pelon called and told them the guide was waiting for them. The two met with a driver of a taxi, who had a guide with him; Sandoval and Sotelo called "El Pelon" to confirm they were the ones being picked up. The two got into a taxi, along with Lozano and Suchite, and drove for about an hour. From there, the four got out of the taxi, along with the guide. The five began walking north, and they entered

10

the United States. They continued walking north until they arrived at a location where the foursome would be picked up; at that point, the guide left. Before leaving, the guide provided a phone number to one of Sandoval's traveling companions. Sandoval thought Lozano got calls at first, but then Suchite received them. The four were told a black Expedition would show up for them. Subsequently, an Expedition arrived and the group got in; they were apprehended shortly after that. Sandoval could not identify the driver of the Expedition during the deposition.

24.     Jose Felipe Antonio Sotelo-Ayala was one of the four aliens found in the Expedition. Per BPA Morales's report, Sotelo told investigators that he is a Mexican citizen and national and that he had crossed the border fence with three other people on March 28. His brother was to pay $7,000 for Sotelo to be smuggled into the United States. Sotelo said that the foursome had been led by a foot-guide; before the foot-guide left the group, he contacted a smuggler, and the smuggler instructed the foursome to get into a black Expedition. The foursome got into the Expedition and Sotelo sat in the back seat. The Expedition drove to a gas station for gas, and was pulled over ten to fifteen minutes after leaving the gas station. Sotelo also identified BOTHERAS in a "six-pack" photographic lineup as the driver of the Expedition.

25.     Subsequently, Sotelo gave a material-witness deposition; in summary, he said the following. Sotelo said that the week before his apprehension, he made arrangements with a family member, who is in the United States, for Sotelo to be brought over the border. Sotelo traveled to Tijuana, where he rented a hotel room with Sandoval. While in Tijuana, Sandoval spoke on the phone with someone and then told Sotelo the plan. The first step was for the two of them to travel to Tecate, by bus. On the bus, the two of them met Lozano and Suchite. When the four got to Tecate, they got into a taxi, and were driven for about an hour. The four got out of the taxi and began walking north, led by Lozano. The four walked into the United States, and continued north until they reached the place where they were to be picked up. When the four reached this place, they had to make a call to let someone know they were there. When they arrived, Suchite made a phone call, and

11

1   appeared to be guiding someone who was involved in arranging the pick-up. Subsequently,
2   the four were picked up by a black Expedition, and were apprehended shortly after that.
3   Sotelo identified a picture of BOTHERAS as the driver of the Expedition during the
4   deposition.

5       26.    Based upon my experience, my training, and my consultation with other
6   investigators who have experience investigating alien smuggling near the border, I
7   understand that smugglers will seek to smuggle aliens from Mexico into the United States
8   in a coordinated way. Smugglers will bring aliens over the border in remote areas far from
9   the Ports of Entry, and then coordinate picking up those aliens in "load cars" that can
10  quickly transport them to areas farther from the border. These "load cars" will often bring
11  such aliens to a location for a hand-off to another person, who will drive the aliens to
12  another location, such as a motel or a house, for the aliens to await the next step in
13  smuggling them to locations in the interior of the United States.

14      27.    Given the facts surrounding the arrests of BOTHERAS, E.J.S., Lozano,
15  Sandoval, Suchite, and Sotelo, and based upon my experience and training, as well as
16  consultation with other law enforcement officers experienced in smuggling investigations,
17  I submit that there is probable cause to believe that information relevant to the smuggling
18  activities of BOTHERAS and others will be found in the **Target Devices**. Such evidence,
19  which could be in the form of communications, records, data (including but not limited to
20  emails, text messages, other social messaging applications), photographs, audio files,
21  videos, or location data:

22          a.     tending to indicate efforts to smuggle illegal aliens into the United
23  States from Mexico, and transport them within the United States;

24          b.     tending to identify accounts, facilities, storage devices, and/or
25  services–such as email addresses, IP addresses, and phone numbers–used to facilitate the
26  aforementioned smuggling efforts;

27

28

12

*Affidavit in Support of Search Warrant*

1          c.     tending to identify co-conspirators, criminal associates, or others

2 involved in smuggling aliens from Mexico into the United States and within the United

3 States;

4          d.     tending to identify travel to or presence at locations involved in the

5 smuggling of aliens from Mexico into the United States and within the United States;

6          e.     tending to identify the movement of proceeds associated with the

7 smuggling of aliens from Mexico into the United States;

8          f.     tending to identify the user of, or persons with control over or access

9 to, the **Target Devices**; and/or

10         g.     tending to place in context, identify the creator or recipient of, or

11 establish the time of creation or receipt of communications, records, or data involved in the

12 activities described above.

13     28.     More specifically, I note that probable cause exists to search the noted **Target**

14 **Devices** on the more particular bases:

15     &bull;  Per the evidence-custody receipts prepared in this matter, **Target Devices 1**

16         and **2** were seized from BOTHERAS. BOTHERAS was observed driving

17         Lozano, Sandoval, Suchite, and Sotelo, said he had found the "transportation"

18         job on Craigslist, admitted that he had picked up the four noted aliens, and

19         admitted that he had been hired to pick people up near the border and transport

20         them.

21     &bull;  Per the evidence-custody receipts prepared in this matter, **Target Devices 3**

22         through **7** were seized from E.J.S., who was traveling with BOTHERAS in

23         the Expedition when he picked up the four noted aliens and described herself

24         as BOTHERAS's girlfriend. E.J.S. told investigators that she filmed the

25         encounter between BOTHERAS and Border Patrol on one of her phones,

26         though it is not clear which.

27     &bull;  Per the evidence-custody receipts prepared in this matter**, Target Device 8**

28         was seized from Sotelo. Sotelo admitted that he was arranging to be smuggled

13

1  into the United States. Sotelo's testimony does not specifically show that he
2  used a phone, but it can be inferred from his testimony that he spoke with a
3  person in the United States about his plans to cross the border, which naturally
4  could have required the use of a phone.

5  • Per the evidence-custody receipts prepared in this matter, **Target Device 9**
6    was seized from Suchite. Suchite admitted that he was arranging to be
7    smuggled into the United States, and his testimony demonstrates that he used
8    a phone in making his arrangements.

9  • Per the evidence-custody receipts prepared in this matter, **Target Device 10**
10   was seized from Lozano. Lozano admitted that he was arranging to be
11   smuggled into the United States, and his testimony demonstrates that he used
12   a phone in making his arrangements.

13   29.    Finally, I note that alien-smuggling conspiracies generally entail planning that
14  includes efforts to evade detection by law enforcement. In my professional training and
15  experience, I am aware alien-smuggling requires planning and coordination in the days and
16  weeks prior to the relevant smuggling event. Additionally, I am aware that co-conspirators
17  are often unaware of a subject's arrest and will continue to attempt to communicate with
18  the subject after the arrest to determine the whereabouts of their valuable cargo, particularly
19  in the hours following the arrest. Therefore, I believe that the appropriate date range for
20  the search of the **Target Devices** is from January 29, 2019 up to and including March 30,
21  2019 (*i.e.*, the day after the events described in this affidavit).

## METHODOLOGY

23   30.    It is not possible to determine, merely by knowing the model and serial number
24  of the **Target Devices**, the nature and types of services to which the devices are subscribed
25  and the nature of the data stored on the devices.

26   31.    Cellular devices—phones and tablets—today can be simple cellular telephones
27  and text message devices, can include cameras, can serve as personal digital assistants and
28  have functions such as calendars and full address books and can be mini-computers allowing

14

for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their devices over the internet and remotely destroy all of the data contained on the devices. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones and tablets do not have hard drives or hard-drive equivalents and store information in volatile memory within the devices or in memory cards inserted into the devices.

32.     Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models, and some tablets, using forensic hardware and software. Even if some of the stored information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

33.     Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and any associated memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

34.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

35.     Law enforcement has not yet attempted to obtain the evidence sought by this warrant.

15

## CONCLUSION

36.     Based on all of the facts and circumstances described above, I believe probable cause exists to conclude that evidence of alien-smuggling will be found on the **Target Devices**.

37.     Because the **Target Devices** were promptly seized following the arrests of BOTHERAS, E.J.S., Lozano, Sandoval, Suchite, and Sotelo, there is probable cause to believe that evidence of the smuggling offense continues to exist on the **Target Devices**. As stated above, I believe that the date range for this search is from January 29, 2019, up to and including March 30, 2019.

38.     WHEREFORE, I request that the court issue a warrant authorizing Border Patrol Agents and/or other federal and state law enforcement officers specially trained in digital evidence recovery, to search the **Target Devices**, as described in Attachment A, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

DEREK D. NOWAK
United States Border Patrol Agent
Department of Homeland Security

Subscribed and sworn to before me on
this _15th_ day of August, 2019.

THE HON. ALLISON H. GODDARD
United States Magistrate Judge

16

*Affidavit in Support of Search Warrant*